IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION


DIANE DILLON                          )
                                      )
                                      )
v.                                    )          No. 2:09-0014
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social Security       )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").[1]

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion

_____

[1] The plaintiff filed this case in the Eastern District of Kentucky, but it was transferred to this District because the plaintiff now lives in this District. *See* Docket Entry Nos. 7-8.

-1-

for judgment on the record (Docket Entry No. 22) should be granted to the extent that this case should be remanded for further action in accordance with the recommendations contained herein.[2]

## I. INTRODUCTION

The plaintiff filed applications for DIB and SSI on August 17, 2004, alleging a disability onset date of February 15, 2003, due to knee pain, foot pain, degenerative disc disease ("DDD"), numbness of fingers and elbows, chronic obstructive pulmonary disorder ("COPD"), paroxysmal positional nystagmus, fibromyalgia, depression, and anxiety. (Tr. 91-92, 496-502.) Her applications were denied initially and upon reconsideration. (Tr. 39-50.) A hearing before Administrative Law Judge ("ALJ") James P. Alderisio was held on March 16, 2006. (Tr. 493-517.) The ALJ delivered an unfavorable decision on May 10, 2006 (tr. 403-409) and the plaintiff sought review by the Appeals Council. (Tr. 414.) On September 29, 2006, the Appeals Council granted plaintiff's request for review and remanded the case back to the ALJ. (Tr. 417-20.) On December 6, 2006, a second hearing was held before the ALJ. (Tr. 521-39.) He delivered a second unfavorable decision on March 21, 2007. (Tr. 18-25.) On April 9, 2008, the Appeals Council denied plaintiff's request for review (tr. 8-11), and the ALJ's decision became the final decision of the Commissioner.

## II. BACKGROUND

The plaintiff was born on April 27, 1958, and was 44 years old as of February 15, 2003, her alleged onset date. (Tr. 80.) She did not complete high school but obtained a General Equivalency Diploma ("GED") (tr. 495) and worked as an assembly line worker and as a waitress. (Tr. 84.)

---

[2] The defendant also filed a motion for judgment on the record (Docket Entry No. 26), but the Court deemed that motion and accompanying memorandum to be a response to the plaintiff's motion for judgment on the record. *See* Docket Entry No. 29.

-2-

## A. Chronological Background: Procedural Developments and Medical Records

From January 14, 2002, to November 3, 2003, the plaintiff presented to Appalachian Regional Healthcare ("ARH") Daniel Boone Clinic in Harlan, Kentucky, on multiple occasions with complaints of depression, right lumbar pain radiating down to her leg, hip pain, elbow pain, polyuria,[3] polydipsia,[2] hot flashes, allergies, and headaches. (Tr. 126-55.) Dr. Moez Premji and Dr. Samir A. Guindi, an Ear, Nose, and Throat ("ENT") specialist, examined the plaintiff; diagnosed her with back pain, allergic rhinitis, COPD, depression, joint pain, external otitis,[3] chronic sinusitis, and bronchitis; recommended that she quit smoking; and prescribed Vioxx,[4] Wellbutrin,[5] Ultracet,[6] Combivent,[7] Clarinex, Allegra,[8] Biaxin, Avelox,[9] Rhinocort,[10] Advair,[11] and a Z-pack *Id.* The plaintiff returned to ARH on multiple occasions between August 10, 2005, and December 2, 2005,

---

[3] Polyuria is "the passage of a large volume of urine in a given period" and it is associated with diabetes. Dorland's Illustrated Medical Dictionary 1486 (30th ed. 2003) ("Dorland's").

[2] Polydipsia is is "chronic excessive thirst and intake of fluid" that can be caused by diabetes. Dorland's at 1479.

[3] External otitis is inflammation of the ear. Dorland's at 1338.

[4] Vioxx is an anti-inflammatory drug used to treat osteoarthritis and rheumatoid arthritis, which was discontinued in 2004. Saunders Pharmaceutical Word Book 756 (2009) ("Saunders").

[5] Wellbutrin SR is an antidepressant that is also prescribed for neuropathic pain. Saunders at 762.

[6] Ultracet is used to treat acute pain. Saunders at 739.

[7] Combivent is an oral inhalation aerosol used to treat COPD. Saunders at 178.

[8] Clarinex and Allegra are antihistamines prescribed for allergic rhinitis. Saunders at 28, 165.

[9] Biaxin and Avelox are antibiotics. Saunders at 72, 96.

[10] Rhinocort is a corticosteroidal anti-inflammatory prescribed for allergic rhinits. Saunders at 615.

[11] Advair is an inhalation aerosol used to treat COPD. Saunders at 15.

with complaints of numb and swollen hands and neck, shoulder, and knee pain. (Tr. 366-82). An MRI of the plaintiff's cervical spine showed moderate diffuse DDD which "causes at least mild to moderate canal stenosis" and x-rays of her left and right knee indicated no bony abnormalities or joint effusion. (Tr. 371-74.) She was diagnosed with acute chronic neck and upper back pain and degenerative joint disease and she was prescribed Lortab.[12] (Tr. 366-82.) A February 16, 2007, x-ray of the plaintiff's chest at ARH showed findings "compatible with COPD." (Tr. 488.)

From January of 2002, until April of 2005, the plaintiff received psychotherapy and counseling at Cumberland River Comprehensive Care Center ("CRC"). (Tr. 214-59.) She was diagnosed with dysthymia, rule out major depression, and rule out PTSD; prescribed Prozac, Trazodone,[13] Ultram,[14] Elavil,[15] Zoloft, and Cymbalta;[16] and assigned GAF scores of 55 and 60.[17] (Tr. 236, 239, 251, 255 ) She reported having back pain (tr. 225-26, 229) and a relapse after "letting her medicines run out" (tr. 242) but her treatment notes indicated that when she took her medication she was able to take care of herself, did not suffer from psychosis or have any suicidal ideation, and was stable. (Tr. 215-38.)

---

[12] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

[13] Prozac and Trazodone are antidepressants which can be used to treat panic disorder. Saunders at 591, 716.

[14] Ultram is a pain reliever prescribed for moderate to severe pain. Saunders at 739.

[15] Elavil is an antidepressant that was discontinued in 2004. Saunders at 256.

[16] Zoloft and Cymbalta are selective serotonin re-uptake inhibitors used to treat depression, panic attacks, and anxiety. Saunders at 196, 779.

[17] The GAF scale considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 43 (4th ed. 2000) ("DSM-IV-TR"). A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." Id.

-4-

From July 3, 2003, to December 22, 2003, the plaintiff presented to Dr. Gregory Dye on five occasions with complaints of arthritic pain, stiffness, fatigue, and pain in her lower back, hip, leg, and abdomen. (Tr. 158-59.) Dr. Dye diagnosed her with arthralgia of unknown etiology, fatigue, abdominal pain, hip pain, and lower back pain; noted that she seemed fixated on pain medicine and that she "refused rheumatologist referral;" and prescribed Naprosyn,[18] Prednisone,[19] and Feldene.[20] *Id.* August 27, 2003, x-rays of the plaintiff's hip and tail bone revealed no abnormalities. (Tr. 160-61.)

Between October 28, 2003, and August 5, 2004, the plaintiff presented to Dr. Yasser A. Nadim, an orthopedic surgeon at Southeast Kentucky Clinic, on multiple occasions with complaints of lower back pain with numbness radiating down her left lower extremity, recurrent back pain, and knee pain. (Tr. 178-82.) Dr. Nadim diagnosed her with stiffness in her lower back, lower back and left knee pain, and mild degenerative joint disease; prescribed Daypro[21] and Vioxx; and recommended that she use a back brace and a transcutaneous electric nerve stimulator ("TENS") unit.[22] *Id.* He also noted that the plaintiff was "known of fibromyalgia rheumatica." (Tr. 184.) A nuclear whole body scan of the plaintiff, MRIs of her left hip, lumbar spine, thoracic spine, and left knee, and x-rays of her lumbar spine and left hip all revealed no abnormalities. (Tr. 185-91.)

---

[18] Naprosyn is a nonsteroidal anti-inflammatory ("NSAID") drug used to treat "mild to moderate pain." Saunders at 252.

[19] Prednisone is anti-inflammatory medication. Saunders at 575.

[20] Feldene is an anti-inflammatory pain reliever used to treat osteoarthritis and rheumatoid arthritis. Saunders at 284.

[21] Daypro is an anti-inflammatory pain reliever used to treat osteoarthritis and rheumatoid arthritis. Saunders at 202.

[22] According to Drugs.com, a TENS unit is a small, battery powered device that is used to control many types of pain by sending mild electrical signals through electrodes attached to the skin. Drugs.com, "How to use a TENS unit" at http://www.drugs.com/cg/how-to-use-a-tens-unit.html.

-5-

From January 19, 2004, to February 17, 2004, plaintiff presented to Dr. Warren Chumley, a neurologist, on multiple occasions with complaints of hip pain, moderate leg pain that was increasing, and back and neck stiffness. (Tr. 169-77.) Dr. Chumley diagnosed the plaintiff with DDD and leg pain, prescribed Gabitril, Neurontin,[23] and Naprosyn, and noted that she had no pain and a full range of movement in her spine. (Tr. 172-75.) An MRI of the plaintiff's cervical spine revealed multiple disc herniations, an MRI of her lumbar spine showed mild DDD, and a Nerve Conduction Velocity/Electromyography ("NCV/EMG") study[24] of her left leg revealed no abnormalities. (Tr. 171, 176-77.)

From February 13, 2004, to August 3, 2004, the plaintiff presented to Dr. Shailander Peesapati on multiple occasions with complaints of migraines, dysuria, and pain in her left hip, lower back, and abdomen. (Tr. 193- 200.) Dr. Peesapati noted that the plaintiff had left hip pain (tr. 200), diagnosed her with anxiety, depression, joint pain, migraines, sinusitis, and a urinary tract infection, and prescribed Zoloft, Trazadone, Ultracet, Zomig,[25] Claritin,[26] Zelnorm,[27] Macrobid,[28] Mobic,[29] Darvocet,[30] and Allegra. *Id.* X-rays of the plaintiff's lumbar spine and left hip revealed no abnormalities. (Tr. 188-89.)

---

[23] Gabitril and Neurontin are anticonvulsants used to treat seizures. Saunders at 310, 488.

[24] A NCV/EMG study measures the electrical activity of muscles at rest and during contraction and how well and how fast the nerves can send electrical signals. WebMD, "Electromyogram (EMG) and Nerve Conduction Studies" at http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

[25] Zomig is prescribed to treat migraines. Saunders at 780.

[26] Claritin is a nonsedating antihistamine and decongestant. Saunders at 165.

[27] Zelnorm is prescribed to treat irritable bowl syndrome. Saunders at 774.

[28] Macrobid is prescribed for urinary tract infections. Saunders at 422.

[29] Mobic is a NSAID used to treat osteoarthritis and rheumatoid arthritis. Saunders at 457.

[30] Darvocet is a narcotic painkiller. Saunders at 202.

-6-

In March and June of 2004, and on three occasions in March and April of 2005, the plaintiff presented to the ARH Emergency Room with complaints of headaches, back and neck pain, and dizziness, and was diagnosed with sinusitis, osteoarthritis, hip pain, and DDD. (Tr. 260-94.)

On November 3, 2004, the plaintiff presented to Dr. Joon Chung, a family practitioner with the Harlan Medical Center, with complaints of chronic back pain and neck pain. (Tr. 364.) Dr. Chung noted that plaintiff had full range of motion in her upper and lower extremities and muscle spasms and tenderness in her cervical and lumbar spine; diagnosed her with a herniated disc, lower back pain, and depression; and prescribed Ultracet, Darvocet, and Flexeril.[31] Id. On March 14, 2005, the plaintiff returned to Dr. Chung and he diagnosed her with chronic lower back pain. (Tr. 363.) Dr. Chung prescribed Salsalate[32] and Prednisone. Id.

On November 23, 2004, the plaintiff was hospitalized at the Pineville Community Hospital in Pineville, Kentucky, for severe constipation. (Tr. 202-08, 212-13.) She followed up with Dr. Madhan Mohan at the Pine Mountain Clinic on three occasions in January and March of 2005, with complaints of back pain and abdominal pain. (Tr. 209-11.) Dr. Mohan noted that the plaintiff had a full range of motion in her extremities and back; diagnosed her with depression, joint pain, constipation, anxiety, and sinusitis; and prescribed Prilosec,[33] Darvocet, Lorcet,[34] Trazodone, Zoloft, Ultracet, Colace, and Miralax.[35] (Tr. 202-05, 209-13.)

On December 14, 2004, Dr. Lea J. Perritt, Ph.D., a consultative non-examining Tennessee Disability Determination Services ("DDS") psychologist, completed a Psychiatric Review

---

[31] Flexeril is a skeletal muscle relaxant. Saunders at 294.

[32] Salsalate is a NSAID. Saunders at 260.

[33] Prilosec is prescribed for ulcers, heartburn, and gastreoesophageal disorders. Saunders at 580.

[34] Lorcet is a pain reliever prescribed to treat moderate to mild pain. Saunders at 415.

[35] Colace and Miralax are laxatives. Saunders at 175, 455.

Technique Form ("PRTF") (tr. 298-312) and diagnosed the plaintiff with anxiety, not otherwise specified ("NOS"). (Tr. 301.) Dr. Perritt concluded that the plaintiff had mild restriction of activities of daily living; mild difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 308.) She also noted that "there is no evidence that [the plaintiff] has a severe psychiatric impairment" and that the plaintiff's allegations did not "appear totally credible." (Tr. 310.)

On June 1, 2005, Dr. Ed Ross, Ph.D., a consultative non-examining DDS evaluator, completed a PRTF (tr. 313-26) and diagnosed the plaintiff with anxiety, not otherwise specified ("NOS"). (Tr. 316.) Dr. Ross concluded that the plaintiff had mild restriction of activities of daily living; mild difficulties maintaining social functioning; and mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation. (Tr. 323.) He opined that the plaintiff had "[n]o severe functional limitations due to mental issues" and did not have a severe mental impairment. (Tr. 325.)

From August of 2005, to March of 2006, the plaintiff presented to Dr. Ziad Sara, an internist with the Harlan Medical Center, with complaints of increasing neck pain, lower back pain, and dizziness. (Tr. 359-61, 396.) Dr. Sara diagnosed the plaintiff with cervical neuralgia, chronic lower back pain, DDD, moderate cervical spinal stenosis, depression, and "questionable benign vertigo;" referred the plaintiff to an ear, nose, and throat specialist ("ENT") for a second opinion on her vertigo; and prescribed Lorcet, Ultram, Papaverine,[36] and a neck collar. *Id.* An August 2005 MRI of the plaintiff's cervical spine revealed moderate diffuse DDD that caused "mild to moderate canal stenosis" (tr. 373-74) and a December 2005 MRI of her left and right knee indicated no abnormalities. (Tr. 371-72.)

From January 31, 2006, to October 26, 2006, the plaintiff presented to Dr. Alan Freid on several occasions with complaints of pain and requesting pain medication. (Tr. 394, 483-87.)

---

[36] Papaverine is a muscle relaxant. Saunders at 532.

-8-

Dr. Freid noted that the plaintiff had a full range of motion in her cervical spine; diagnosed her with spinal stenosis, degenerative joint disease, and fibromyalgia; and prescribed Darvocet, Flexeril, Prilosec, Robaxin,[37] and Albuterol.[38] *Id.* He also noted that the plaintiff sought more and stronger pain medication and recommended that she go to a pain clinic.

On March 24, 2006, Dr. Guindi examined the plaintiff and diagnosed her with paroxysmal positional nystagmus and a cervical herniated disc. (Tr. 397-400.) He recommended that the plaintiff undergo physical therapy and opined that "she is unable to get gainful employment for at least one year." (Tr. 397-98.) On June 6, 2006, Dr. Ronald S. Dubin, an orthopedist, examined the plaintiff and found that her cervical spine had a full range of motion in her cervical spine and mild tenderness in her cervical spine, thoracic spine, and lumbar spine. (Tr. 460-61.) He noted that the plaintiff was wearing a back brace and cervical collar; diagnosed the plaintiff with fibromyalgia, vertigo, and "[s]tatus post carpal tunnel syndrome;" and opined that she could not perform any job that required "repetitive bending, stooping, lifting or crawling." *Id.*

### B. Hearing Testimony March 16, 2006: The Plaintiff and a Vocational Expert

The plaintiff's first hearing in this case was held on March 16, 2006, before ALJ Alderisio. (Tr. 491-518.) The plaintiff was represented by an attorney, and she and William Ellis, a Vocational Expert ("VE"), testified at the hearing. (Tr. 491.)

The plaintiff testified that she had not completed the ninth grade but that she did receive a GED. (Tr. 495.) She related that she had previously worked as a waitress and waitress trainer, and as an assembly line worker. (Tr. 495-97.) The plaintiff explained that she tried to take classes at a medical assistant school but was not able to complete them because of hip pain that radiated down

---

[37] Robaxin is a skeletal muscle relaxant. Saunders at 619.

[38] Albuterol is an inhaler used in treatment or prevention of bronchospasm. Physicians Desk Reference 3393 (64th ed. 2010) ("PDR").

her leg, and she related that she tried to take computer classes at Kentucky Works but could not "even sit through the first meeting" because she had a panic attack. (Tr. 497.)

The plaintiff testified that she had carpal tunnel surgery that "released the pressure" and helped her sleep.[39] (Tr. 499.) She related that she wears a neck brace because she has four herniated discs in her cervical spine and has left knee and hip pain, depression, spondylosis, and COPD. (Tr. 499-501, 505-06.) The plaintiff testified that her knees give out if she walks down steps and that she moves around constantly, is only able to stand for ten minutes at a time because her knees will "lock in place," and is able to prepare simple meals. (Tr. 506-08.) She related that, if she walks "very far," her muscles become sore and she has shortness of breath, that she suffers from headaches, and that her vertigo causes dizziness. (Tr. 509.)

The plaintiff testified that she takes Darvocet, Flexeril, Motrin, and Hydroxyzine,[40] which makes her drowsy and constipated, and that she takes Zoloft, Amitriptyline,[41] and Trazodone to treat her depression. (Tr. 510-11). She explained that she has panic attacks whenever her routine changes or if she is around crowds. *Id.* The plaintiff related that she goes to the grocery store with her husband, attends church, does minimal cleaning around her house, drives occasionally, and prepares simple meals but that her husband does most of the cooking. (Tr. 511-12.)

The VE, consistent with the Dictionary of Occupational Titles ("DOT"), classified the plaintiff's past relevant jobs as an assembler, waitress, and inspector as light work. (Tr. 515.) The ALJ asked the VE to consider what jobs plaintiff could perform at the medium work level with the following restrictions: occasional stooping or crouching; no crawling; no climbing of ladders, ramps or scaffolding; and avoidance of hazardous machinery. *Id.* The VE answered that the plaintiff could

---

[39] It appears that the plaintiff had carpal tunnel surgery in 1994 and 1995, prior to her asserted onset date. *See* Tr. 169 and 204.

[40] Hydroxyzine is an antihistamine. Saunders at 357.

[41] Amitriptyline is an anti-depressant. Saunders at 43.

work as a laundry worker or janitor. (Tr. 516.)  The VE testified that the number of jobs available would not change from his previous response if the plaintiff were limited in her ability to demonstrate reliability, to behave in an emotionally stable manner, and to deal with work stresses and the public. *Id.*

The ALJ next asked the VE to consider what jobs the plaintiff could perform at the light work level if she had the following restrictions: a sit/stand option every 30 minutes to accommodate her knee, hip, and back problems; occasional stooping or crouching; avoidance of hazardous machinery, vibrational areas, and "psychologicals of limited but satisfactory in dealing with the public work stresses, behaving in an emotionally manner, and demonstrating reliability," and the VE answered that she could work as an amusement attendant or production worker. (Tr. 516-17.)  The ALJ also asked the VE whether the plaintiff could work if he made a finding that "she was severely limited but not precluded regarding behaving in an emotionally stable manner, that she would be severely limited but not precluded regarding demonstrating reliability, dealing with stresses, [and] dealing with coworkers and the public," and the VE responded that she would be precluded from working. (Tr. 517.)

### C. Hearing Testimony December 5, 2006: The Plaintiff and a Vocational Expert

The plaintiff's second hearing in this case was held on December 5, 2006, before ALJ Alderisio. (Tr. 519-39.)  The plaintiff was represented by an attorney, and she and William Ellis, a VE, testified at the hearing. (Tr. 519.)

The plaintiff testified that medical tests indicated that the bones in her thoracic spine were demineralizing and that the bones in her lower spine were "turning osteopenic." (Tr. 522.)  She related that she wakes up nightly because her fingers lose feeling, that she has pain in both knees that radiates to her feet, and that her depression has worsened. (Tr. 522-23.)  The plaintiff explained that she began working at the age of 14, that the heavy lifting that she performed over the years has

-11-

contributed to her physical problems, that she is not able to afford physical therapy, and that she loses her balance easily due to vertigo. (Tr. 523-25, 531.)

The plaintiff related that she takes Elavil, Trazodone, Zoloft, Hydroxyzine, Albuterol, Darvocet, Methocarbamol, and Ibuprofen. (Tr. 527-28). She testified that her fibromyalgia causes soreness, pain, and burning through different parts of her body; that she has neck pain, back pain, and muscle spasms; and that she has to wear a neck brace to keep her head balanced. (Tr. 528-30.) The plaintiff related that she only drives if there is an emergency, that she does not attend church frequently, that she is not able to sit for extended periods of time, and that she does not go shopping unless her husband "makes [her] get out of the house." (Tr. 532).

The VE testified that the plaintiff's prior jobs as an assembler and as an inspector would be classified as heavy work, but he noted that she performed both of those jobs and her work as a waitress at the light level. (Tr. 533). The ALJ asked the VE what jobs would be available to the plaintiff if she could perform low stress medium work with the following restrictions: no exposure to vibrating machinery or hazardous machinery; no exposure to unprotected heights; no climbing of ropes, ladders, or scaffolding; no crawling; and only occasional stooping and crouching, and the VE answered that plaintiff could work as a child care worker or as an inspector. *Id.*

The ALJ next asked the VE what type of jobs would be available to the plaintiff if she could perform light work with the same physical restrictions in the previous hypothetical; had a sit/stand option of 45 minutes; was severely limited but not precluded from dealing with the public, supervisors, and coworkers; had limited but satisfactory ability to deal with stress; had limited but satisfactory attention and concentration; and had limited but satisfactory ability to understand, remember, and carry out simple instructions, and the VE answered that she could work as a food preparation worker and packer. (Tr. 534.)

The ALJ then asked the VE if any of his responses would change if the ALJ found plaintiff to be capable of work at the sedentary level with the same restrictions as the previous hypotheticals

-12-

with the following added restrictions: no exposure to dust, fumes, smoke, chemicals, or noxious

gasses in order to accommodate her COPD. (Tr. 534.)  The VE replied that only the job as a food

preparer would be affected since food preparation workers could be exposed to fumes. (Tr. 535.)

Finally, the ALJ asked the VE what types of jobs would be available to the plaintiff if vertigo

diminished her ability to walk or move about and the VE answered that it would eliminate all jobs.

*Id.*

The plaintiff's attorney asked the VE if any of the plaintiff's testimony would change his

answers, and the VE replied that, if her testimony regarding her vertigo and the pain in her knees,

back, and neck were credible, she would be precluded from working. (Tr. 535-36.)


### III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on March 21, 2007. (Tr. 18-25.)  Based on the

record, the ALJ made the following findings:

1. The claimant meets the nondisability requirements for a period of disability and Disability Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for benefits through the date of this decision.

2. The claimant has not engaged in substantial gainful activity since the alleged onset of disability.

3. The claimant's combination of impairments are considered "severe" based on the requirements in the Regulations 20 CFR §§ 404.1520(c) and 416.920(c).

4. These medically determinable impairments do not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation No. 4.

5. The undersigned finds the claimant's allegations regarding her limitations are not totally credible for the reasons set forth in the body of the decision.

-13-

6.      The claimant has the residual functional capacity to perform a range of medium exertion that involves no exposure to vibrations, hazardous machinery or heights.  The claimant can never climb ladders, ropes or scaffolds but can occasionally stoop and crouch. Based on mental limitations, the claimant is limited to work in a low stress environment and no production rate jobs.

7.      The claimant is unable to perform any of her past relevant work (20 CFR §§ 404.1565 and 416.965).

8.      The claimant is a "younger individual between the ages of 45 and 49" (20 CFR §§ 404.1563 and 416.963).

9.      The claimant has a "high school (or high school equivalent) education"  (20 CFR §§ 404.1564 and 416.964).

10.     The claimant has no transferable skills from any past relevant work and/or transferability of skills is not an issue in this case (20 CFR §§ 404.1568 and 416.968).

11.     The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR §§ 404.1567 and 416.967).

12.     Although the claimant's exertional limitations do not allow her to perform the full range of medium work, using Medical-Vocational Rule 203.29 as a framework for decision-making, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs are included in the body of this decision.

13.     The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision  (20 CFR §§ 404.1520(g) and 416.920(g)).

(Tr. 24-25.)

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

-15-

support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment." A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

-16-

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Foster*, 853 F.2d at 490 (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must

-17-

come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The five step inquiry

In this case, the ALJ resolved the plaintiff's case at step five of the five-step process. (Tr. 25). At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity ("SGA") since August 26, 2003, her alleged onset date. (Tr. 24.) At step two, the ALJ found that the combination of plaintiff's discogenic and degenerative disorders of the cervical spine and affective mood disorder were severe impairments. (Tr. 21.) At step three, the ALJ determined that

-18-

the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 24.) At step four, the ALJ concluded that the plaintiff could perform a limited range of medium work but could not perform her past relevant work. (Tr. 25.) At step five, the ALJ found that the plaintiff could work as a child care provider and as an inspector. (Tr. 24.)

### C.  The plaintiff's Assertions of Error

The plaintiff contends that the ALJ erred in evaluating her subjective complaints of pain and failed to provide "good reasons" for discounting the medical findings of her treating physician. Docket Entry No. 23, at 9-13.  The plaintiff also argues that the ALJ erred in concluding that she could perform a significant range of medium work. Docket Entry No. 23, at 6-11.

### 1. The ALJ erred in analyzing the plaintiff's subjective complaints of pain.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of pain.  Docket Entry No. 23, at 9-11.  Specifically, the plaintiff alleges that the ALJ failed to "discuss the pain standard as articulated in [*Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986)] and *Felisky*." *Id.* at 10.  The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ.  The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted).  However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

-19-

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL 374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. §§ 404.1529, 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[42] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected

---

[42] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

-20-

to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

The ALJ concedes that there is objective medical evidence of the plaintiff's medically determinable impairments, satisfying the first prong of the *Duncan* test. (Tr. 21.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 404.929(c)(3).[43]

In his second decision, the ALJ noted that he

> considered the claimant's subjective complaints of pain in light of Social Security Ruling 97-7p. The evidentiary record as a whole does not confirm the degrees of limitation alleged by the claimant. The claimant's testimony and allegations are not

---

[43] The seven factors under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

-21-

fully credible. However, giving the claimant the benefit of the doubt, I have limited her to medium exertion with postural and environmental limitations appropriate for individuals with degenerative disk disease.

(Tr. 22.)

Although the ALJ determined that the plaintiff's subjective complaints of pain were not fully credible, it is difficult to for this Court, and understandably for the plaintiff, to discern how he arrived at that conclusion given his failure to discuss any of the seven factors provided in 20 C.F.R. §§ 404.1529(c)(3) and 404.929(c)(3). Further contributing to the confusion of how the ALJ addressed the plaintiff's subjective complaints of pain is the fact that there are two separate decisions from the ALJ in the record. (Tr. 18-25, 403-409.) The ALJ's first decision, dated May 10, 2006, addresses the plaintiff's subjective complaints of "dizzy spells" and arthritis in her back, left knee, and hip (tr. 406-07), but in the ALJ's second decision, dated March 21, 2007, he noted that

> [t]he 2006 decision adequately summarized the medical evidence of record at the time it was rendered, and therefore it does not need to be reiterated. Consequently, I incorporate that discussion as if fully written here. However, I specifically do not incorporate the prior Judge's findings of fact and conclusions of law.

(Tr. 20) (Internal citations omitted). The confusion arises because the ALJ's summary of the medical evidence in his May 10, 2006, decision appears under the "findings of fact and conclusions of law" section of that decision. (Tr. 405-11.) In addressing the plaintiff's subjective complaints of "dizzy spells" the ALJ explained that he assigned no weight to Dr. Guindi's diagnosis that the plaintiff had vertigo (tr. 407) and in discussing the arthritis in her back, left knee, and hip, he concluded that diagnostic testing showed no abnormalities. (Tr. 406-07) However, the Court is precluded from considering that rationale since the ALJ explicitly noted in his March 21, 2007, decision that he was not adopting the findings of fact and conclusions of law from the May 10, 2006, decision. (TR. 20.)

-22-

As noted in *Kalmbach*, "while credibility determinations regarding subjective complaints rest with the ALJ, those determinations must be reasonable and supported by substantial evidence." 2011 WL 63602, at *13 (6th Cir. Jan. 7, 2011). The ALJ simply did not provide sufficient specific reasoning for his conclusion that the plaintiff's subjective complaints of pain were not fully credible and that failure to provide supporting substantial evidence constitutes reversible error.

### 2. The ALJ properly considered the findings of the plaintiff's nontreating physician.

The plaintiff contends that the ALJ "did not provide good reasons for discounting the opinions and conclusions of [her] treating specialist," Dr. Guindi. Docket Entry No. 23, at 11. According to the Regulations, there are three different medical sources who may provide evidence: nonexamining sources, nontreating sources, and treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[44] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. § 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but who does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant] or has provided [the claimant] with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* The Regulations characterize "an ongoing treatment

_____

[44] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

relationship" as a relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(d)(2) (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010) and *Hensley v. Astrue*, 573 F.3d 263 (6th Cir.2009)). This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .*'" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9, 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 416.927(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 416.927(d)(2)).

-24-

The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[45] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

In this case, Dr. Guindi is not a treating source since he only examined the plaintiff on one occasion. Tr. 397-400. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) (a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship"); *Abney v. Astrue*, 2008 WL 2074011, at *11 (E.D. Ky. May 13, 2008) (a psychiatrist who met with the plaintiff one time and signed a psychological assessment of that visit was not a treating physician because one meeting "clearly cannot constitute the 'ongoing treatment relationship'" described in 20 C.F.R. § 404.1502). However, even though Dr. Guindi is not an acceptable treating source, and thus the treating physician rule does not apply to him, the ALJ must still consider his medical findings. Dr. Guindi is a consultative examining source and the Regulations require the ALJ to evaluate his medical findings in light of

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6).

---

[45] The rationale for the "good reason" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in her case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

As discussed *supra*, the record contains two decisions from the ALJ, one from May 10, 2006, and one from March 21, 2007, and in the March 21, 2007, decision, the ALJ explained that he was adopting the summary of the medical record evidence from the May 10, 2006, decision but not his prior findings of fact and conclusions of law. Tr. 20. *See supra* at 21-22. In the May 10, 2006, decision the ALJ concluded that

> ENT Dr. Samir A. Guindi also evaluated the claimant and wrote in a memo that the claimant had positional nystagmus (vertigo) and would need physical therapy to improve her balance. Dr. Guindi also said that the claimant had cervical herniated discs, but this conclusion was apparently based on the claimant's subjective complaints. He further said the claimant was unable to "get gainful employment for at least one year. . . ." It appears that Dr. Guindi only examined the claimant on one occasion and, therefore, had no treating relationship with the claimant. No weight has been given to this opinion.

(Tr. 407.) In the ALJ's most recent March 21, 2007, decision, he cited Dr. Guindi's March 24, 2006, treatment note, but noted that Dr. Sara "reported [that] he felt the claimant had paroxysmal positional nystagmus and physical therapy was recommended" and concluded that the evidence "indicates these symptoms are mild and there is no evidence of vocationally relevant restrictions." (Tr. 20.)

The Commissioner acknowledges that the ALJ, in his 2007 decision, incorrectly attributed the plaintiff's diagnosis of paroxysmal positional nystagmus and need for physical therapy to Dr. Sara instead of to Dr. Guindi. Docket Entry No. 30, at n.29. Dr. Sara diagnosed the plaintiff with "questionable benign positional vertigo" and referred her to an ENT specialist (tr. 396), but Dr. Guindi was the only physician to diagnose the plaintiff with "paroxysmal positional nystagmus" and recommend that she have physical therapy. (Tr. 400.) Although the ALJ erroneously attributed Dr. Guindi's diagnosis to Dr. Sara, it is clear that the ALJ considered Dr. Guindi's treatment note. (Tr. 20.)

Additionally, the ALJ did not discount Dr. Guindi's diagnosis of "paroxysmal positional nystagmus," but rather ultimately concluded that her symptoms were mild and the medical record evidence supports that conclusion. (Tr. 20.)  The plaintiff complained of dizziness on March 21, 2005 (tr. 256), and again on March 20, 2006, when she presented to Dr. Sara. (Tr. 396.)  As discussed *supra*, Dr. Sara diagnosed her with "questionable benign positional vertigo" and referred her to an ENT specialist, Dr. Guindi, who subsequently diagnosed her with paroxysmal positional nystagmus and recommended physical therapy. (Tr. 400.)  On June 6, 2006, Dr. Dubin also diagnosed the plaintiff with vertigo. (Tr. 460.)  Although Dr. Guindi noted that the plaintiff would be "unable to get gainful employment for at least one year" (tr. 398), a determination that is reserved for the ALJ, *see* 20 C.F.R. § 404.1527(e)(1); *Gant v. Comm'r of Soc. Sec.*, 372 Fed.Appx. 582, 584-85 (6th Cir. Apr. 7, 2010) ("Conclusory medical opinions are properly discounted as only the Commissioner can make the ultimate determination of disability."); *Brock v. Comm'r of Soc. Sec.*, 368 Fed.Appx. 622, 625 (6th Cir. Mar. 8, 2010) (citing 20 C.F.R. § 404.1527(e)(3)) ("[N]o 'special significance' will be given to opinions of disability, even those made by the treating physician."), his treatment note did not indicate the severity of her paroxysmal positional nystagmus and he did not prescribe any medication. (Tr. 400.)  Further, even though Dr. Sara diagnosed the plaintiff with "questionable benign vertigo" and Dr. Dubin diagnosed her with vertigo, neither physician indicated the severity of that impairment or prescribed treatment for it. (Tr. 396, 460-61.)

As noted by the ALJ, the record evidence does not show that the plaintiff's vertigo is a significant impairment.  The ALJ considered Dr. Guindi's treatment note, in accordance with 20 C.F.R. §§ 404.1527(d)(2)-(6), 416.927(d)(2)-(6), before determining that Dr. Guindi's ultimate conclusion that the plaintiff could not work for at least a year (tr. 397) was not supported by his own

medical findings or the record medical evidence. (Tr. 20.) In sum, the ALJ properly evaluated Dr. Guindi's medical findings and there is substantial evidence in the record to support his determination.

Since the credibility evaluation of the plaintiff's subjective complaints of pain could affect the plaintiff's assigned RFC, the Court will not address the plaintiff's remaining assertions of error regarding her RFC.

## V. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 22) be GRANTED to the extent that the case should be remanded to the ALJ to properly evaluate and explain the credibility of the plaintiff's subjective complaints of pain.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____

JULIET GRIFFIN
United States Magistrate Judge

-28-